Good morning, Your Honors. Good morning. If he's a court, I will reserve five minutes for rebuttal time, if that pleases you. If you're on the clock, we'll try to help you. This case is about the statutory requirement for the plan administrator of an employee benefits plan to furnish specific kinds of documents when requested in writing by participant or beneficiary. ERISA Section 104b.4 states that the plan administrator shall, upon written request, furnish a copy of a number of documents, including, as applied in this specific case, contracts or other instruments under which the plan is established or operated. Here, Appellant Mark Zavislak made just a request as a beneficiary of the Netflix, Inc. Incorporated Health and Welfare Benefits Plan. At the beginning, at the very beginning of 2021, Zavislak sent a letter to Netflix requesting documents governing the plan. Netflix ignored this letter. Zavislak followed up with a second letter to the registered agent of Netflix, this time quoting 104b.4 and reiterating his request. Counsel, we, respectfully, we know what the record says.  And we appreciate your doing that. But it's, you're dealing here with our Hughes Salaried Retirement Action Committee versus administrator of the Hughes Non-Bargaining Retirement Plan on bank opinion. That's right. Which is controlling, obviously, of our three-judge panel. And that held that Section 104b.4 calls for the disclosure only of documents, and I now quote, that provide individual participants with information only of documents that provide individual participants with information about the plan and benefits. Now, you disagree, I know, but Netflix takes the position that based on that case, they gave you all you're entitled to. You disagree. Why? We disagree, Your Honor, respectfully, because Hughes was evaluating the other instruments clause of Section 104b.4. It was not evaluating the remainder of the clause or the remainder of the statute, which was specifying all the other kinds of documents that are expressly required for it. But what would your, again, quoting our case, what would your client learn from these other documents, many of which are already public, that is not, if you will, required under the Hughes case? Sure. Well, from a pragmatic perspective, when Netflix provided the SPDs, the SPDs themselves, two of them outright disclaim that the reader should rely on them at all. All four of them point to other contracts that are controlling. As a matter of benefits, there was a travel cancer benefit that was applied in 2021 that did not exist in 2020, and the SPD that was provided to Mr. Zabislak regarding that would have contained all of his medical benefits did not address that particular benefit, so he would not have known if that had come up in his need for seeking benefits. So from your perspective, you want us to determine that the documents that were not provided essentially complied with the Hughes case, that they simply didn't provide what was needed for your client to understand his benefits and rights under the plan. Is that right? No, Your Honor, respectfully, because the SPDs are a necessary component of furnishment production, but they're not sufficient. The statute requires the production of SPDs, both automatically and also upon request, but when Hughes talks about documents necessary for the beneficiary to understand his rights, it talks about understanding the plan and benefits, not just the benefits. So here, to the extent the SPD can, assuming argument of the SPD covers all the benefits, which the SPDs in this case, as provided, didn't, even assuming that, the beneficiary is entitled to production, furnishment of documents that cover the plan as well. Even under the Hughes case? That's not how I read that case. Well, the reason under the Hughes case that that applies is because it takes for granted that every other element of the statute prior to other instruments is to be provided. There's no — Why do you say that? Because it's — well, first of all, because Hughes is reliant upon the legislative history language of 104b-4. So all of the statements that Hughes makes as to needed to be provided are really — have already been said in the legislative history. So in the Senate report, it's drawing from that language. And ultimately, it's really simply focused on the other instruments. Because at issue in Hughes was a contact list, so the list of names and addresses that the appellants in that case were trying to get provided for whatever reason. But the names — a list of names and addresses does not establish or operate a plan. It is simply a — it may be a planned document, but it doesn't actually cause the operation or — or underlie the establishment of the plan itself. Can I ask — just to make sure I understand your argument, you're saying that you're not — that Hughes doesn't govern this case, right? Are you also making the argument, even if Hughes governed this case, that you should still win? Judge Bumate, thank you. I wouldn't say that Hughes doesn't govern the case. I just think that the purpose of Hughes was to evaluate the other instruments clause, and it was taking for granted the fact that all of the other items in the statutory list — trust agreements, bargaining agreements, contracts — are to be provided. And that's background. That's an assumption that Hughes is making. Yeah, but, I mean, if you look textually at the statute, the other instruments part under which the plan is established or operated should also go to — that modifier should also go to contracts and trust agreements and, frankly, I think, bargaining agreements. Absolutely. There's no — yeah, no disagreement there. The — So then how come — how come we don't take the gloss that Hughes did on other instruments and apply it to all the other parts of the — You absolutely should. You should apply under which the plan is established or operated. And all of the contracts that Mr. Zavislak requested establish or operate the plan. They are the plan for all intents and purposes. So I guess I don't understand that. Then Hughes does govern. Yes. I don't disagree. Hughes absolutely governs. The issue is that Hughes was only really talking about the other instruments clause. And so when it says — when we're talking about other instruments under which the plan is established or operated, it's saying that all of the previous items in the list, it's assuming, it's taking for granted. And Shaver does the same thing as it follows Hughes. It takes for granted the fact that all of the other — sorry — all of the other kinds of categories of documents in the statute are going to be provided to the requester. And why do you say that? Again, I read our en banc opinion as being a very practical one. They're saying, okay, the plan beneficiary needs to know what his or her rights are under the plan. It's a common-sense matter. You seem to be saying that everything else in the plan, even though it wasn't specifically there, was subsumed into Hughes's reasoning and whether or not the person would have the slightest understanding of what some of these collateral third-party documents were. They still have to be produced. I don't understand Hughes to be saying that. I understand Hughes to be an eminently practical, common-sensical application of 104B2. What am I missing? Your Honor, I believe that you are right that it is a practical application of production. Nonetheless, Hughes is taking for granted the fact that these other documents are to be produced because they are the plan. In fact, Hughes says the relevant documents are those that provide individual participants with information about the plan and benefits. So the SPDs provide essentially a list, an enumeration of benefits that are available to participants and beneficiaries. But the SPDs are not the plan. They do not constitute the plan. They cannot constitute the plan because they don't undertake the requirements of a plan as set forth, for example, in Section 402 or 29 U.S.C. 1102B, actually A and B. A talks about naming a fiduciary. B talks about establishing amendment procedures. It talks about funding to and from the plan. It talks about allocation of fiduciary duties. And I'm forgetting the fourth one at the moment. But each plan must incorporate these types of these features in order to be a valid plan under ERISA. And the plan contracts in this case do exactly that. Without those plan contracts, you don't have a plan, and the beneficiary participant requesting is entitled to the plan, not just the benefits. As I recall, you agreed with the other side that this would be submitted in the form of a summary judgment. You presented your documents to the district court. The folks at Netflix presented theirs, right, and you allowed the judge to make a determination basically as a matter of law and fact. Is that right? That's right. And in this case, you just think the judge just misinterpreted Hughes? That's exactly right, Your Honor. Yeah. And I have my five minutes remaining. Oh, sure. Please save your time. I'll wait for rebuttal. Thank you. Very well. All right. So, Mr. . . . Do you say it Rillo or Rio or . . . ? However you say it, let's say it right. It's Rillo. The what? It's Rillo. Rillo. Okay. Rillo it is. I've had the opportunity to appear before Your Honor, and I appreciate it. Rillo it is. Your Honor, good morning, and may it please the Court. My name is Christopher Rillo from Baker Botts, and I represent Netflix in this appeal, and I represent them down below. I think, Your Honor, and it's funny how things go. I had written already an address, and I think it's better to jump to where you're at. I think Your Honor, as an analyst, this issue is precisely right. Hughes does control, and under Hughes, the ancillary documents, which fall into three categories. The first are the administrative contracts with each one of the service providers. There's four of those. The second are really getting in the weeds, something called the plan matrix, which is basically . . . So, counsel, even if . . . so if you agree, we all agree that Hughes controls, what about the preventative care guide and the prior authorization list? They're controlled by the regulation, Judge Momente, and the regulation says that if they're so voluminous they can't be attached to the SPD, all you need to do is reference them in the SPD and provide them for free, and that's exactly what happened. Judge Davila made a finding. Is that consistent with 104B, though? It says you have to furnish it. It is consistent. Because you furnish the SPD, and 104B doesn't . . . and under the regulation, I'll give you the regulation so you all can see it's in our briefs, but under the regulation, it allows you to . . . it allows you to reference it and provide it for free. Mr. Zavaslak, the one list, the prior approval list, is a computer link, and so you go to the computer and you can download it. It's several hundred pages, but it's there. Well, I'm just asking, is that consistent with 104B's command that you have to furnish it? Are you furnishing something if you say, you know, this is how you . . . go find it yourself? Yes, you are, because the regulation says all you have to do is . . . Well, I don't care about the regulation. I'm caring about the text of 104B-4. Is that consistent with furnishing something? It is, as long as you furnish the SPD that contains information as to how you can access it. Is it a textual matter? I'm not so sure. How do you get there textually? You get there textually because it says that you have to produce the SPD, and the regulation . . . Well, you have to furnish a copy . . . Of the SPD. Yes. And you furnish the SPD, and the SPD had in it the reference, the computer link, to link the prior authorization list, so you go to a computer. It also had in it . . . But that means you have to go out and get it yourself. I'm not so sure that's consistent with furnishing it. We would . . . The regulation does apply here. I understand what you're saying about the text. I mean, the text governs. I'm sorry, but 104B-4 governs, not the regulation. Well, you furnish the SPD, and the SPD has that information in it. If you didn't do it otherwise, Judge Bumate, you'd have an SPD that was 700 pages. And that's why the regulation allows you to incorporate that.  And he got, as Judge Davila made a finding, again, these are findings of fact, and we're applying under clear error. He made a finding that Mr. Zavislak was not prejudiced. He was able to obtain this information, and I asked him that as deposition, and he agreed that he did get both the preventative care guide and the prior approval list. And you furnished all of these documents electronically, correct? We did. Okay. So either way, someone was going into a computer . . .  . . . and accessing something electronically. Correct. At Mr. Zavislak's request, Judge Barker, we did that electronically. And in the agreement that you had to submit this by summary judgment, was reference made to the regulation in how these extensive documents were made available from your perspective pursuant to 104B-2? Well, sure. It's reference in the judge's findings. There's a finding of fact on that, that that's what our obligation was. And there's also reference that Mr. Zavislak was not prejudiced because he easily obtained, for no cost, the information. In this kind of a situation, you know, of course, we've had a lot of changes about Chevron and Auer and maybe not Auer yet. Do any of those recent Supreme Court analyses of the deference we give to agencies apply? Do we even need to consider those? I don't think so because there's no agency deference here.  And Chevron certainly didn't evaluate and validate existing agency regulations such as the one Judge Bumate and I were discussing. But you turn to the documents that Mr. Zavislak wants. First of all, you turn to the documents that were produced. Can I ask you, do you think Hughes was correctly decided? Is that a proper interpretation of the text of 104B-4? Yes, I do. Okay. And the reason why is it's a practical approach. It does reference contracts, but it's a bare reference to contracts. And Shaver and Hughes applied the — I'm going to botch this. This is why my nun told me not to become a priest. Juicium de generis. There's a ruler right there on that. But he applied the Latin statutory interpretation text where you have specific items. If you read the statute, it's remarkable. You can read everything you have to provide up until you come to the word contracts. And Judge Bumate, a plan enters into, as an ERISA lawyer, I know this, tens if not hundreds of contracts, everything from a lease for the premises to employment agreements to agreements with investment advisors or health care advisors in the case of a plan like this. And so you have to modify that list to see if it has some reference to what's been provided before and also take refuge in Hughes's language that what you need to do, which follows the Firestone Supreme Court case, by the way, as well as legislative history, is give the participant or beneficiary all the information they need in order to apprise them of their rights under the plan, their obligations. Can I ask, you know, the end of the statute goes under which the plan is established or operated. What does that connect to? What is that referring to? Is that just to other instruments or is that referring to contracts as well? I think it refers to contracts as well. But you also have the gloss from Hughes that you have to give people what they need to know. I'm just asking textually. Does it go to trust agreement as well? I think it does, yes. And bargaining agreement? Yes. And then what about any terminal report? Is that something different? It is. A terminal report would come if you were for a pension plan, if you were going to end the pension plan and distribute proceeds or wind it up. Okay. Can I change the subject a little bit? You take umbrage to the district courts awarding $765 in statutory penalties pursuant to 1132C1B. Obviously, you won on the Hughes element of it, the major portion of it. As you know, the statute allows the district court discretionary authority to award such a penalty even though small if it is not, in quotes, illogical, in quotes, implausible or without support in the record. Your opponents say basically what the district judge did was ridiculous here because they ruled against them and then also ask that there be a $765 penalty. You disagree with that. I do.  Why? Because there was the EBSA, the Department of Labor, pursuant to statutory authority, issued an order. You have to remember this is the middle of the coronavirus pandemic, excuse me. And the coronavirus pandemic, as we all remember, we were basically working out of our homes for two years. Netflix was shut down essentially. The Santa Clara Department of Health issued an order shutting Netflix down. It had a very skeleton crew there to respond to mail. Now, instead of using an email or alerting Netflix, even contacting the benefits department and, again, the record showed that Mr. Zavezlak's wife was a very highly placed executive at Netflix. She was making well over a million dollars in compensation. She was a director of the company, not a corporate director but the title director. Instead of using those avenues to get the documents, he sends a snail mail in the middle of the pandemic to Netflix when the corporations closed. But more importantly, the Department of Labor notice, which is, again, statutory, said that all deadlines for Title I, which included 104, were excused. You just had to act reasonably. And the court, in imposing these sanctions, although the court made several references to it during the case, did not respond and explain how that applied. Furthermore, the court made a finding that we acted in good faith. Mr. Zavezlak said repeatedly we're in bad faith, and the court made a specific finding, which is in the findings, 176, that Netflix acted in good faith in handling this matter. So under the circumstances, it was illogical for the penalty to be awarded, right? It was. But more importantly, let's look at what happened when Netflix got attention. Mr. Zavezlak then used the method that was bound to get Netflix attention, which is serving on the corporate designated agent for service, CT Corporation. That got the in-house legal department involved. The in-house legal department immediately sent an email to Mr. Zavezlak saying, what is your relationship with the plan? Because his name didn't appear. He threw his wife, who has a Chinese surname. He explained. And they said, fine, we'll get you the documents. And they did that within eight days. Can I ask, is there other consequences to that award? Oh, there is. It feels like this argument costs more than the penalty.  I mean, we were going to pay it and then fight an attorney's fee award down below. So they would get attorney's fees? Yeah. They might get attorney's fees. I'm not going to concede that. We could argue, of course, that we were really the prevailing party. But that's why we cross-appealed. We're not. I mean, we can afford $700, for heaven's sakes. But we don't think that should have been awarded. And we think we were indeed. I mean, that's also stung a little bit, given the findings that we were acting in good faith and how this all came about. So the whole award is, from your perspective, stunning in light of the good faith finding and the fact that there was a COVID illness going on. And the DO, Department of Labor, said you don't have to comply with these deadlines. Right. You have to act reasonably. And that's what we did. And under the labor regulation, you have to act in good faith. And then you have to furnish the documents when it's practicable, right? Right. And you're essentially saying, well, the district court never made a finding that you acted later than was practicable, right? Right. Acting in bad faith. The good faith thing is very clear. But you accept that practicable is a second part of the test, right? We do. And it's just you're saying it wasn't found here. It was not. But we did act in practicable. I mean, sending a letter when your surname is different on the plan to a corporation that's dead, in effect. I mean, these are the times when I was practicing law of my house. And when the upper flat, my wife was working downstairs and the dog would shuttle between the two. I mean, the coronavirus was something I hope we never see again. But sending a letter is almost guaranteed not getting one's attention. I take it your wife is not registered with CT Corp. No. No, no. She has other attributes, but no. So, Judge Barker, you hit the nail on the head. It's exactly right. And there weren't those findings and it stung because we acted in good faith. And there's collateral consequences here. I mean, we think ‑‑ Unless I'm interrupting. Could I circle back to the first issue and ask if you could explain the relationship, if any, between the Section 104 disclosure requirement under ERISA and any separate disclosure requirement for claims administration? Absolutely. I think that's maybe Section 503. 503. Under 503, you have to disclose all the documents relied on in adjudicating a claim. And there's separate regulations, Your Honors, that implement those regulations. They're very detailed. So do you think that the 104 disclosure obligation is potentially less broad in covering documents than 503? Absolutely. And I think some of the information that he says that Mr. Zabislak states was available in the claims administration agreements was really 503. For example, he seizes on a phrase, a single phrase in a four-page statement of the benefits in the VSP, the vision agreement, that indicates appeals have to be handled this way. Well, if there was a claim, I could understand that. But the VSP booklet that's already given, that was given by Netflix in response to its 104 production ‑‑ at least a little bit, that isn't a purpose of the 104 disclosure that a beneficiary shouldn't have to wait until they're making a claim and have incurred a cost to know what their coverage is? No. No. He knew what his coverage was. But you don't ‑‑ do you think it's odd in any way that 104 would not require disclosure of the same documents that would later govern, once a beneficiary makes a claim, whether they get some claim to benefit? Not at all. Well, let me explain it another way, which is it's undisputed that to interpret the plan and to implement it, the Netflix administrator only relied on the seven documents that was given to Mr. Zavezlak. They didn't look outside those documents. And those documents also are so robust, we present expert testimony on it, because expert testimony can show what the fiduciary level of behavior is. Those documents are so robust that our experts said these are some of the finest documents I've ever seen in my 35 years of practice. I had the same reaction to them. The collective health SPD is 102 pages. If you read it, and Mr. Zavezlak admitted in his deposition he did not read it. He read little bits and pieces of it, he said. That's page 30 of his deposition. If you read it, you will know virtually anything you need to know about this health plan and what your rights are. I see my time has expired, Your Honors. Let me ask my colleague whether either has additional questions. Thank you for your argument. We appreciate it.  All right. Mr. Balloon, you have some rebuttal time. Thank you, Judge Smith. I'd like to talk very briefly about what Shaver and Becker say about Hughes. Shaver states that the statute mentions only legal documents that describe the terms of the plan, its financial status, and other documents that restrict or govern the plan's operation. So Shaver is clear that Hughes was focused on the other instruments clause and that all of the documents that must be provided are the type that govern and restrict the plan's operation, which include contracts. And then Becker comes along and says, rather, the en banc panel limited the other instruments category to those similar in nature to the documents specifically listed in 1024B4. So Becker is recognizing that Hughes was really talking about the other instruments and trying to, because a catch-all phrase can be very broad, and so Hughes was saying, look, the other instruments clause isn't any more broad than the items previously stated in the statute, which includes contracts. So by definition, contracts. I guess that's not how I read the statute. I read, and was discussing with your colleague, is that as I read it, it's the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated. So that last modifier goes to everything before it up to the bargaining agreement. Perhaps I'm not being clear, Judge Bumate. I completely agree with you. Okay. Every item in that list is modified by the phrase under which the plan is established or operated. And so, I mean, my colleague, my friend, mentioned the idea of lease agreements and, you know, perhaps janitorial agreements and other things. None of those are producible under 1024B4, under 104B4. We're talking about contracts under which the plan itself is established or operated. And those claims administration agreements do establish the plan because they talk about amendment procedures, payment procedures, allocation of fiduciary duties. Yeah, but then you have to give the gloss a hues, which is they have to be about entitlement to benefits. No. The gloss on hues is that they have to give information about the plan or benefits. They have to enable a person to the relevant documents or those documents that provide individual participants with information about the plan and the benefits. It's not just benefits. It's not just what's on the SPD. It's also what constitutes the plan itself. So if your honors would give me the allowance here, I'd like to talk about the VSPEOC, the evidence of coverage. The evidence of coverage, this is on SCR479, states, the evidence of coverage constitutes only a summary of the vision plan. The vision plan document, meaning the group vision care plan, must be consulted to determine the exact terms and conditions of coverage. So someone, Mr. Zavislak or someone else, looking at their benefits on the SPD necessarily has to go back to the group contract in order to be assured that whatever benefits they have are actually the ones that they're looking at, because this document itself disclaims itself as governing. With respect, you're a smart lawyer. Lawyers can read these things and fall asleep every night. Hughes, to me, is the quintessential, hey, this is what the average worker looks at. They don't have the slightest idea about these collateral documents, and what you need to give them is what the ordinary person will understand about his or her plan. That's how I read Hughes. You've taken off the gloss of it, and you basically said, no, they really, really, really need to read these complex documents. I think your friend said that in the aggregate there were like 700 pages. Even your client said he didn't read but pieces of the booklet. So I'm struggling with how Becker really changes anything in that. Hughes, you may not like Hughes, but that's what I understand our court did. It was, if you will, it was the praise of the common man. I think that's what they were shooting for, and you're doing just the opposite. What's your response to that? Well, Your Honor, I don't think I'm doing the opposite. What I'm saying is that Hughes commanded administrators to give documents that would enable beneficiaries to understand the plan or benefits. It's clear. It's not just saying benefits. The gloss on Hughes is really about the fact that the plaintiffs or the appellants were asking for a very sort of outer limits document inside the plan that was not plan governing, and this was a way of cabining the other instruments clause so that there wouldn't be abuse of that clause. But it wasn't saying that just because a common man might not be able to understand a contract that another common man who requests it isn't entitled to that contract. And, in fact, he is. Any other questions by my colleague? Thanks to both counsel for your arguments. We appreciate it. The case just argued. Zavislak v. Netflix is submitted.
judges: SMITH, BUMATAY, Barker